**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NOVA CHEMICALS CORPORATION (CANADA), and NOVA CHEMICALS INC. (DELAWARE), | ) ) ) | |
| | ) | C.A. No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | |
| THE DOW CHEMICAL COMPANY, | ) ) | |
| Defendant. | ) ) | |

**COMPLAINT FOR INDEPENDENT ACTION
IN EQUITY TO RELIEVE NOVA FROM A PRIOR JUDGMENT**

Plaintiffs NOVA Chemicals Corporation and NOVA Chemicals Inc. (collectively

"NOVA"), by its undersigned counsel, bring this independent action in equity to relieve NOVA

from a prior judgment and allege as follows:

PARTIES

1.     NOVA Chemicals Corporation is a corporation organized under the laws of New

Brunswick, Canada with a principal place of business at 1000 Seventh Avenue S.W., Calgary,

Alberta T2P 5L5.

2.     NOVA Chemicals Inc. is a corporation organized under the laws of Delaware

with a principal place of business at Westpointe Center, 1555 Coraopolis Heights Road, Moon

Township, Pennsylvania 15108.

3.     On information and belief, The Dow Chemical Corporation ("Dow") is a

corporation organized under the laws of Delaware with a principal place of business at 2030

Dow Center, Midland, Michigan 48674.

JURISDICTION AND VENUE

4.      On October 21, 2005, Dow sued NOVA in this judicial district for infringement of United States Patent No. 5,847,053 ("the '053 patent," Ex. A) and United States Patent No. 6,111,023 ("the '023 patent," Ex. B). *The Dow Chemical Corp. v. NOVA Chems. Corp.*, C.A. No. 05-737, D.I. 1.

5.      This Court had subject matter jurisdiction over such claims of infringement in that prior lawsuit pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court had personal jurisdiction over the parties in that prior lawsuit, and venue was proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1400(b).

7.      A judgment of infringement against NOVA was entered on June 18, 2010 and made final on August 26, 2010. *The Dow Chemical Corp. v. NOVA Chems. Corp.*, C.A. No. 05-737, D.I. 538, 615 (the "Delaware trial").

8.      This Court has ancillary jurisdiction over this action because it was the Court that rendered the original judgment.

9.      Dow is incorporated in the State of Delaware, has a regular or established place of business in the State of Delaware, is authorized to do business and is doing business in the State of Delaware. Therefore, Dow is subject to personal jurisdiction in the State of Delaware.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) in that Dow resides in this judicial district, the original action that Dow brought against NOVA was filed and tried in this judicial district, and a substantial part of the events giving rise to the claim asserted herein occurred in this judicial district.

## CONSOLIDATED STATEMENT OF FACTS

**Introduction**

11.     As further set forth in detail below, Dow repeatedly maintained during the Delaware trial and on appeal that it had standing as owner of the patents-in-suit because the 2002 "Contribution Agreement" did not effectuate a mass transfer of its patent portfolio to a tax shelter holding company.  New evidence indicates that Dow's representations were false, that Dow was not the patent owner, that Dow withheld critical documents relative to patent ownership, and that Dow did not have standing.  In a recent tax litigation, a Dow executive involved in the tax and valuation of Dow's patents testified that "all" of Dow's patents were, in fact, transferred in 2002.  Dow's testimony to the contrary in the NOVA litigation in order to manufacture its standing to bring suit in this Court was false and misleading.  Had this Court been privy to these newly disclosed facts, it would have dismissed Dow's complaint for lack of standing.

12.     In addition, new information has come to light that Dow presented false and misleading evidence in the Delaware trial concerning both the accuracy of and manner in which its tests designed to prove infringement were conducted.  Recent trial testimony by Dow's own expert witness from the Delaware trial in a related litigation brought by Dow in Canada ("the Canadian Action") demonstrates that he falsely represented to the Delaware trial jury that he had successfully separated, and then measured, a "Component B" required by the claims.  In fact, he knew contamination preventing separation was an issue and never believed that separation was possible.  Without these representations, Dow could not have sustained its burden of proving infringement.

**Procedural History Regarding Standing**

13.     In its Complaint, Dow averred that it was the owner of the two patents-in-suit. D.I. 1 at ¶¶ 14-15.  As recognized by Judge Farnan in denying Dow's motion for an injunction and by Circuit Judge Reyna when dissenting on appeal, the evidence raised serious questions about whether Dow actually owned the patents-in-suit.  But for its false and misleading arguments regarding patent ownership, Dow could not have sustained its burden in proving standing.

14.     Fact discovery in the prior litigation ended in January, 2009, and dispositive motions were to be filed by June 19, 2009.  However, on the last day on which dispositive motions could be filed, Dow produced to NOVA for the first time a "Contribution Agreement" with an effective date of Jan. 1, 2002 between Dow and a wholly-owned Dow subsidiary, Dow Global Technologies, Inc. ("DGTI").

15.     The Contribution Agreement was intended to reduce Dow's state taxes by assigning its patents to DGTI, and then licensing these patents back to Dow.  June 16, 2010 Trial Tr. at 235.

16.     Consistent with its intended tax sheltering, an express object of the Contribution Agreement, as stated in its preamble, was that "[Dow] wishes to contribute to DGTI, to the extent it is able, *all* [Dow] Patent Rights."  [Emphasis added.]  Patent Rights were defined as "*any and all* patents . . . which are owned solely or controlled by [Dow] as of the Effective Date", subject to certain exceptions.  [Emphasis added.]  In the operative transfer clause of the agreement, Dow stated that it "hereby conveys, transfers, assigns, and delivers to DGTI … *all* of its right and title to and interest in the Patent Rights . . . ."  [Emphasis added.]  In a separate

sentence in the definition of "Patent Rights," the Contribution Agreement provided that patents being transferred to DGTI would be listed on an attached Schedule A.

17.     On the same day in June 2009 on which it finally produced the Contribution Agreement, Dow also produced for the first time certain schedules that are referenced in that agreement.  Dow subsequently admitted that these schedules had been newly prepared only a few weeks prior to their production to NOVA, and that they did not exist at the time the suit against NOVA was filed in 2005, when ownership would have been necessary for standing.

18.     One of the schedules produced by Dow on June 19, 2009 was a document labeled "Schedule A."   This Schedule A was an undated, one page document which listed no patents at all, but simply stated that "[as] of the Transfer Date, this Schedule includes all Patent Rights of [Dow] . . ., excluding the Excluded Patents set forth in Schedule 'D.'"

19.     Another schedule produced by Dow on June 19, 2009 was a document labeled "Schedule D" listing the patents-in-suit as Excluded Assets.  However, Dow admitted that it prepared this document only days earlier by adding the patents-in-suit, thus making it appear as if they had not been transferred to DGTI in 2002.  Subsequently, on July 10, 2009, and only after being pressed by NOVA to do so, Dow produced the original Schedule D prepared by Dow in 2002, which did not list the patents-in-suit as Excluded Assets.

20.     Dow also produced for the first time in June 2009 a "Quitclaim Assignment" between Dow and DGTI, dated only four days before these documents were produced, in which the two Dow entities stated that "to remove any potential doubt as to ownership" of the patents-in-suit they were now agreeing that Dow was the owner of the patents.

21.     On July 10, 2009, Dow produced a document labeled "Schedule B Supplement" that, although modified after Dow filed its Complaint on October 21, 2005, was alleged by Dow

to be Schedule A to the Contribution Agreement.   Dow was unable to produce any version of

Schedule A prepared contemporaneously with the Contribution Agreement or any version

prepared prior to the commencement of the lawsuit.   Dow also offered no explanation regarding

how to reconcile the Schedule A produced on June 19, 2009 with the Schedule B Supplement,

alleged by Dow to also be Schedule A.

22.     In fact, as subsequently admitted by Dow, the patents-in-suit did not appear on

any Schedule in existence when the suit commenced on October 21, 2005.  Dow CAFC

Opposition Brief, No. 2010-1526, at 36.

23.     In light of these belatedly-produced documents, NOVA brought a motion in July

2009 to dismiss the litigation for lack of standing by Dow or, in the alternative, to seek further

discovery on these matters.  Briefing on the motion was completed in August, 2009.  The Court,

however, did not act on the motion until the pretrial conference in late May 2010.

24.     Trial of this case was set for May 2010.  At the pre-trial conference the day before

trial, Judge Farnan refused NOVA's request for a trial on the standing issue before the jury trial

on the merits and instead set a one-day trial of the standing issue to take place after the jury trial.

He permitted NOVA to take very limited discovery of Dow on this issue while the jury trial was

on-going.

25.     Subsequent to the jury's finding that the Dow patents were valid and infringed,

Judge Farnan conducted a bench trial of this issue on June 16, 2010.  Mr. Bruce Kanuch, a

retired Dow in-house lawyer, testified at the standing trial that information provided to him

confirmed his belief no U.S. patents issued prior to 2002 were assigned to DGTI. June 16, 2010

Tr. at 35.

26.     In its subsequent memorandum and order of July 30, 2010, the Court denied NOVA's motion to dismiss for lack of standing.  D.I. 600.  However, in a separate order also dated July 30, 2010 denying Dow's request for an injunction, the Court noted that there were "substantial issues for appeal, including the question of standing that exists in this action."  D.I. 603 at 2 (footnote omitted).

27.     In NOVA's appeal to the Federal Circuit, Dow continued to deny that the Contribution Agreement was a mass transfer of its patents to DGTI, and maintained that it was carefully structured to transfer only those patents that did not fall within certain exceptions, including a "loss of rights."   Dow CAFC Opposition Brief, No. 2010-1526, at 6, 33, 39; see also oral argument of Dow's counsel, CAFC Oral Argument Transcript, No. 2010-1526, at 9 ("They were very, very careful about" not putting pre-2002 U.S. patents on Schedule A "because you're going to lose rights if you sue.").

28.     Moreover, Dow argued that the District Court was correct in finding that listing the patent rights on Schedule A was a necessary prerequisite for transferring any patent rights from Dow to DGTI.  Dow CAFC Opposition Brief, No. 2010-1526, at 33, 36, 38.

29.     The Federal Circuit affirmed the District Court's holding in a split decision.  *Dow Chem. Co. v. Nova Chems. Corp.*, 458 Fed. Appx. 910, 916 (Fed. Cir. Jan. 24, 2012).

30.     Circuit Judge Reyna filed a 28-page dissent on the standing issue.  Judge Reyna concluded that "the Contribution Agreement overall provided that upon execution DGTI was to receive *all* of Dow's 'Patent Rights' as generally defined above, regardless of whether Schedule A existed or what might have been listed on it." *Dow Chem. Co. v. Nova Chems. Corp.*, 458 Fed. Appx. 910, 923 (Fed. Cir. Jan. 24, 2012) (emphasis added).  In addition, he concluded that the exception in the definition of "Patent Rights" as to "loss of rights" applied only to patents

asserted by Dow in U.S. litigations that were "pending" at the time the Contribution Agreement became effective in 2002. "Since the patents-in-suit were not asserted against NOVA until 2005, they were not excepted from transfer under the 'loss of rights' clause, and as such were transferred to DGTI under the Contribution Agreement." *Id*. at 931.

31.     In October 2012, the Supreme Court denied NOVA's petition for a writ of certiorari. The matter then returned to this Court, where it is now pending. However, even in its brief in opposition to NOVA's *certiorari* petition, Dow continued to assert that "Dow and DGTI structured the Agreement so that patents were *not* transferred *en masse*." [Emphasis in original.]

### New Information Has Come to Light Establishing that Dow Falsely and Misleadingly Represented Facts to this Court About Its Standing

32.     In 2013, NOVA became aware of a decision rendered by the United States District Court for the Middle District of Louisiana in *Chemtech Royalty Associates L.P. v. United States,* 2013 WL 704037 (M.D. La. Feb. 26, 2013) ("the Louisiana action"). In that lawsuit, the United States filed a counterclaim for negligence and substantial underpayment of income tax against Chemtech and Dow arising out of two series of transactions ("Chemtech I" and "Chemtech II") alleged to be abusive tax shelters. The District Court found in favor of the United States and assessed a 20% penalty against Dow. An appeal filed by both parties is pending in the U.S. Court of Appeals for the Fifth Circuit.

33.     The Chemtech I transaction is similar in structure to the 2002 Contribution Agreement. While the 2002 Contribution Agreement was designed to achieve a tax benefit for Dow at the state level, the Chemtech I transaction was designed to achieve a tax benefit for Dow at the federal level.

34.     In Chemtech I, Dow set up an intellectual property holding company known as Diamond Technology Partnership Company ("DTPC").   By means of an April 30, 1993 Contribution Agreement, Dow assigned 68 of its U.S. patents to DTPC.

35.     On the same day, DTPC entered into a separate April 30, 1993 Contribution Agreement with Chemtech, a Swiss partnership made up of a foreign subsidiary of Dow along with other investors, wherein DTPC reassigned 68 of Dow's high value patents to Chemtech in exchange for a Class B Limited Partner interest in Chemtech I.

36.     On April 30, 1993, Dow and Chemtech I also entered into their own agreement wherein Chemtech licensed all of these patents back to Dow, which paid royalties to Chemtech for the use of those patents which it used as federal tax deductions.

37.     Due to a change in U.S. tax laws, most of the Dow patents that were assigned to Chemtech in 1993 were later assigned back to DTPC in 1998.

38.     In 2002, DTPC's name was changed to DGTI, the entity that NOVA alleges to be the true owner of the patents-in-suit at the time the lawsuit was filed.  The 2002 Contribution Agreement refers to this change, and explicitly provides that all patents then held by DTPC were now deemed to be property of DGTI.

39.     At the trial of the Louisiana action, Chemtech/Dow called Mr. Edward Valenzuela as a witness in its defense.  Mr. Valenzuela was a valuations specialist employed in the tax department at Dow until his retirement in 2007.  In this capacity, he was involved in the Chemtech I transaction.  Among other things, he worked with the outside consulting firm of Arthur D. Little in preparing an evaluation for tax purposes of the patents transferred from Dow to DTPC, and then to Chemtech, in 1993.  He was also familiar with the royalty payments made

by Dow to Chemtech under their license agreement. *See*, *e.g.*, Chemtech June 21, 2011 Trial Tr. (Vol. 2) at 216.

40.     Mr. Valenzuela testified on direct examination by Dow's own counsel that, after the patents were assigned back from Chemtech to DTPC in 1998, he continued to compute royalty payments for Dow, and that Dow continued to make royalty payments to DTPC through the end of 2001, after which "all" of Dow's patents were contributed to a successor Dow holding company [DGTI].  Chemtech June 21, 2011 Trial Tr. (Vol. 2) at 254.

41.     On cross-examination, Mr. Valenzuela elaborated that Dow continued to make royalty payments to DTPC until 2002 when the new intangible holding company, a Dow subsidiary, came into existence.  He twice re-affirmed that "all" of Dow's patents were contributed to this new intangible holding company that "collected all of Dow's patents." Chemtech June 21, 2011 Trial Tr. (Vol. 2) at 259-70.

42.     The intangible holding company referenced in Mr. Valenzuela's testimony was DGTI.  The preamble to the 2002 Contribution Agreement specifically refers to DGTI as "the entity formerly known as . . . 'DTPC.'"  This is also confirmed by the fourth WHEREAS clause in the 2002 Contribution Agreement, and Article 8 of the 2002 Contribution Agreement stating that this agreement "supersedes the Prior Contribution Agreement as of the Transfer Date."

43.     Mr. Valenzuela's testimony makes clear that positions taken by Dow's witnesses and counsel in the Delaware trial and appeal to the effect that the 2002 Contribution Agreement was not a mass transfer of Dow patents (including substantial U.S. patents) to DGTI were false and misleading, as shown by Mr. Valenzuela's testimony and the underlying tax-savings purpose behind the execution of the 2002 Contribution Agreement.  *Cf. Dow Chem. Co. v. Nova Chems. Corp.*, 458 Fed. Appx. 910 at 927 ("[T]o find that no patents were transferred unless and until

listed on the Schedule A ignores Section 9.07, nullifies the transfer set forth in Section 2.01, renders superfluous the detailed and specific definition of Patent Rights in Section 1.07, and rearranges the fundamental purpose of the tax and business scheme intended under the agreement as a whole.") (Reyna, J., dissenting).

44.     Mr. Kanuch, in particular, falsely testified that no U.S. patents prior to 2002 were assigned to DGTI.  One of the trial exhibits in the Louisiana action was an internal Dow memorandum dated July 27, 1993 from W.R. Norris of Dow's Patent Department to six Dow employees, including Mr. Kanuch.   This memorandum, which was never produced by Dow to NOVA, stated that "[t]his is just a reminder that ownership of the patents listed in Exhibit A [*i.e.*, the 73 U.S. patents, 68 of which had originated with Dow] has been transferred to a foreign partnership [Chemtech I] and TDDC [The Dow Chemical Company] has become a licensee under these patents."  Chemtech returned those U.S. patents to DTPC in 1998, and DGTI was the successor to DTPC under the 2002 Contribution Agreement.  Dow produced this document in the Chemtech litigation in the 2007-2008 time period, before Mr. Kanuch testified in the Delaware trial, yet on information and belief knowingly permitted Mr. Kanuch to give false testimony to the contrary.

45.     Dow continued to falsely argue at trial and on appeal that "Dow and DGTI structured the Agreement such that patents were not transferred *en masse*" and that the only Dow patents transferred to DGTI under the 2002 Contribution Agreement were those specifically enumerated in Schedule A.  *See*, *e.g.*, Dow CAFC Opposition Brief, No. 2010-1526, at 16-17; June 25, 2010 Dow letter brief at 5-8 and 9-10.

46.     This new and contradictory evidence demonstrates that Dow misrepresented the facts, adopting one position in Delaware which effectively repudiated the underlying tax-savings

purpose behind the 2002 Contribution Agreement in an attempt to meet its burden in establishing

standing jurisdiction despite the fact that it had adopted a completely different position in

Louisiana in an attempt to avoid tax liability.  Although Dow alleged to the Delaware Court, to

the Federal Circuit, and to the U.S. Supreme Court that it did not intend the en masse transfer  of

U.S. patents to DGTI because that allegedly would have created a "loss of rights" for Dow, *see*

June 25, 2010 Dow letter brief at 8-10 and 16, its position is undermined by Mr. Valenzuela's

testimony and the fact that it knowingly transferred some 68 "high value" U.S. patents from Dow

to DTPC and ultimately to DGTI, all the while paying royalties for its own use of such patents.

*See*, *e.g.*, *Chemtech Royalty Associates L.P. v. United States,* July 23, 2011 Trial Tr. (Oriel) at 10

(purpose of the Chemtech transaction "was to use high-value patents in . . . a financing project

for the company"). Moreover, this new evidence demonstrates that the district court's and

Federal Circuit majority's reliance on credibility of Dow's witnesses was severely misplaced.

47.     Dow withheld production of DGTI agreements until June 2009, despite the fact

that their production was called for by NOVA's document requests.  On information and belief,

this was done with the intention of delaying NOVA's knowledge of the existence of the 1993

Contribution Agreements.

48.     NOVA was unaware of Mr. Valenzuela's testimony or the existence of the July

27, 1993 Dow internal memorandum until after the decision in the Louisiana action was

published in February 2013.  The 1993 Dow internal memorandum and the 1993 Contribution

Agreements were never produced to NOVA either during discovery in the Delaware case or at

any time thereafter.

49.     Had the same information been disclosed by Dow during the original litigation, Dow could not have sustained its burden of proving ownership of the patents in view of the 2002 Contribution Agreement.

**Dow's False and Misleading Infringement Position**

50.     Dow obtained a judgment from this Court that claims 1, 2, 5, and 8 of the '023 patent and claims 6, 7, 10, and 12 of the '053 patent were infringed by certain grades of NOVA's SURPASS resins.  Claim 1 of the '023 patent and Claim 6 of the '053 patent were the only asserted independent claims of those patents.  Dow's judgment, however, was based on false and misleading testimony, without which it could not have met its burden of proof.

51.     Both independent claims recite an ethylene polymer composition comprising a certain homogeneously branched Component A polymer having, *inter alia*, "a slope of strain hardening coefficient [SHC] greater than or equal to 1.3" and a heterogeneously branched Component B polymer having, *inter alia*, a weight in the range of "from about 5 percent (by weight of the total composition) to about 90 percent (by weight of the total composition)" and a density in the range of "from about 0.93 $g/cm^3$ to about 0.0965 $g/cm^3$".  Accordingly, to prove infringement, Dow was required to show that the accused SURPASS resins satisfied all limitations of both Component A and Component B, including the slope of strain hardening coefficient of Component A and the heterogeneously branched and weight percent and density properties of Component B.

52.     New evidence from recent trial admissions by Dow's expert, Dr. Soares, in the Canadian Action shows that Dow and its expert presented knowingly false testimony and fraudulently manipulated evidence in the Delaware trial to support its contentions that these claim limitations were met.

53.     In the Delaware trial, Dow took the position that the heterogeneously branched Component B material required by all claims of the patents-in-suit was a higher density fraction ("HDF") in NOVA's accused SURPASS products that is made in NOVA's Reactor 2.

54.     To convince the jury that the required Component B was present, Dr. Soares testified that he separated the HDF from SURPASS using Temperature Rising Elution Fractionation ("TREF"), a technique that separates polymer components by their temperature-dependent crystallization properties.  According to his testimony in the Delaware trial, the HDF appeared as "a separate peak" in TREF curves of bulk SURPASS and, therefore, was "relatively easy to cut . . . off" for further testing.  Trial Tr. at 1081-82.

55.     Relying on the demonstrative trial exhibit PDEM-0544 (shown below), Dr. Soares specifically maintained at the Delaware trial that the peak appearing above 90° C in the TREF curve (the right side of the red line) corresponded to Component B, and that he was able to separate Component B simply by collecting polymer fractions eluting above 90ºC.  In fact, Dr. Soares repeatedly emphasized to the jury that such separation was "easy."  Trial Tr. at 1081-82.



**FIG. 1**: Dow demonstrative trial exhibit PDEM-0544.

56.     However, Dr. Soares falsely represented to the jury that he had successfully separated Component B when he knew that such separation was neither certain nor complete.

57.     In his September 2013 trial testimony in the Canadian Action, Dr. Soares admitted that samples of "separated" HDFs were, in fact, contaminated with a distinct polymer component, made in NOVA's Reactor 1 ("R1"), alleged by Dow to be the claimed Component A.   He stated that "the way the [TREF] fractionation was performed, we didn't get a clean cutting off. . . .   [P]art of this material in here [(i.e., the 'separated' HDF] is actually being collected from the material that is present in reactor 1, which corresponds to this big, tall peak here, component A." Soares Canadian Trial Testimony, Sept. 11, 2013, pg. 385.  That is, the HDF component was not separated from the other polymers in SURPASS.

58.     Dr. Soares further testified in the Canadian Action that he "didn't believe" at any time that the TREF technique he used could separate blends of materials that have similar crystallization properties, and that to do so is "[p]erhaps impossible."  Soares Canadian Trial Testimony, Sept. 12, 2013, pgs. 635-36.  This is irreconcilable with his testimony in the Delaware trial that he had, in fact, separated off the HDF and that it was "relatively easy" to do so.  June 3, 2010 Trial Tr. at 1081-82.

59.     Because Dr. Soares expected that the alleged Component B (HDF) was contaminated with the distinct alleged Component A, his representation to the Delaware trial jury that he had, in fact, separated the HDF as the alleged Component B was knowingly false.

60.     Dr. Soares' false representations were highly material to the claimed limitations for Component B, specifically that it comprise at least minimum weight percent (at least 5%) of the whole polymer, that it be heterogeneously branched, and that it have a minimum density.

61.     First, as admitted by Dr. Soares in the Canadian Action, the contaminating polymers from R1 increased the apparent weight percent of the separated component by as much as 30%.  Soares Canadian Trial Testimony, Sept. 11, 2013, pgs. 382-83.  That is, because he

could not actually separate the HDF from the rest of the polymers, the HDF appeared to have a larger weight percent.  In the Canadian Action, Dr. Soares endeavored to mathematically adjust the HDF weight percent to account for the R1 contamination in some samples.  But, despite being aware of the contamination issue and never having believed that the closely related polymers could be separated, in the Delaware trial he did not even endeavor to adjust the measured weight percentage for any sample.

62.     Second, Dr. Soares admitted in his Canadian trial testimony that the R1 reactor material that "contaminat[ed]" the high density fraction made it appear "even more" heterogeneously branched.  Soares Canadian Trial Testimony, Sept. 11, 2013, pg. 407.   In the Delaware trial, such contamination, which Dr. Soares knew was an issue, would have caused the alleged heterogeneity of the HDF; again, a critical and highly contested limitation in Dow's infringement case.

63.     Third, Dr. Soares knew that his density measurement and his related testimony on the "separated" material were false.  Indeed, he admitted in the Canadian Action that part of "separated" sample measured for density was R1 reactor material and that he did not collect the lower density tail of the HDF, which was not a distinct peak but, rather, had "some tailing here that indicates that this peak [i.e., the HDF peak] kind of goes under the other one [i.e. the R1 peak]."  Soares Canadian Trial Testimony, Sept. 12, 2013, pg. 710.

64.     But for Dow's false and misleading testimony in the Delaware trial, it could not have met its burden of proof on infringement.

**Dow's Actions Have Irreparably Tainted the Delaware Trial**

65.     The propriety of the entire Delaware trial proceeding has been irreparably tainted by Dow's fraudulent actions, requiring that the existing judgment be set aside to prevent a great

16

miscarriage of justice.

66.     Under the circumstances, it would be inequitable and manifestly unconscionable to permit the Court's June 18, 2010 judgment to continue to be enforced.

67.     Dow's fraud manipulated the jurisdiction of this Court.

68.     Dow's fraud prevented NOVA from obtaining the benefit of its defense.

69.     Evidence of Dow's fraud would have made a difference in advancing NOVA's noninfringement defense before the Delaware trial jury and in the impeachment of Dow's witnesses.

70.     Dow's fraudulently-obtained judgment was entered through no fault, negligence, or laches on the part of NOVA.

71.     There is no other adequate remedy at law available to NOVA.

PRAYER FOR RELIEF

WHEREFORE, NOVA respectfully requests that the Court set aside the June 18, 2010 judgment, and grant the following relief:

A.     Entering an Order vacating the prior judgment;

B.     Entering an Order requiring Defendant Dow to reimburse NOVA for all damages (including pre- and post-judgment interest) paid to it prior to the date of such an Order in connection with Civil Action No. 05-737;

C.     Entering an Order dismissing Dow's claim to supplemental damages in Civil Action No. 05-737;

D.     Declaring this case exceptional under 35 U.S.C. § 285 and awarding NOVA its reasonable attorney fees and costs associated with this action and with Civil Action NO. 05-737; and

E.       Awarding NOVA such further relief as the Court deems just and proper.


                                                        POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Ford F. Farabow, Jr.                              By:  */s/ Richard L. Horwitz*
Darrel C. Karl                                               Richard L. Horwitz (#2246)
Ronald A. Bleeker                                          David E. Moore (#3983)
Mark J. Feldstein                                           Hercules Plaza, 6th Floor
FINNEGAN, HENDERSON, FARABOW,              1313 N. Market Street
 GARRETT & DUNNER, L.L.P.                         Wilmington, DE 19801
901 New York Avenue, N.W.                          Tel:  (302) 984-6000
Washington, DC  20001-4413                          rhorwitz@potteranderson.com
(202) 408-4000                                              dmoore@potteranderson.com

H. Woodruff Turner                                *Attorneys for Defendants*
Thomas A. Donovan                             *NOVA Chemicals Corporation (Canada),*
K&L GATES LLP                                   *and NOVA Chemicals Inc. (Delaware)*
210 Sixth Avenue
Pittsburgh, PA  15222-2613
(412) 355-6500

Louis J. Freeh
Lawrence Byrne
PEPPER HAMILTON LLP
620 Eighth Avenue
New York, NY  10018-1405
(212) 808-2720

Raymond A. Miller
PEPPER HAMILTON LLP
500 Grant Street
Pittsburgh, PA  15219-2507
(412) 454-5813


Dated:  September 23, 2013
1123667/ 29645