**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NOVA CHEMICALS CORPORATION (CANADA), and NOVA CHEMICALS INC. (DELAWARE), | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )  C.A. No. 13-1601-LPS |
| THE DOW CHEMICAL COMPANY, | ) ) |
| Defendant. | )  **PUBLIC VERSION** ) |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR
SANCTIONS, ATTORNEYS' FEES, AND COSTS**

SEITZ ROSS ARONSTAM & MORITZ LLP
Collins J. Seitz, Jr. (#2237)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
cseitz@seitzross.com

*Counsel for Plaintiffs NOVA Chemicals Corporation (Canada), NOVA Chemicals Inc. (Delaware), and its Counsel*

Dated:  October 20, 2014

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   NOVA'S COUNTERSTATEMENT OF FACTS ..............................................2

    A.    Dow's Conduct and Valenzuela's Testimony Raised Serious Issues About
        Whether Dow Misled the Courts About Its Standing to Enforce Its Patents ..........2

    B.    Dr. Soares Gave Testimony in the Canadian Action that Undermined the
        Key Elements of His Testimony in the Original Infringement Action ...................5

    C.    NOVA and Its Counsel Conducted a Careful Pre-Suit Investigation .....................7

    D.    NOVA's First Amended Complaint in Response to Dow's Motion to
        Dismiss...................................................................................................................9

    E.    NOVA Sought the Advice of Former Federal Circuit Chief Judge Paul R.
        Michel ..................................................................................................................12

III.  ARGUMENT .......................................................................................................13

    A.    The Court Should Not Impose Sanctions Under § 1927 or Its Inherent
        Power ...................................................................................................................13

    B.    The Court Should Not Award Attorneys' Fees Against NOVA Under
        § 285....................................................................................................................17

        1.    This Is Not an "Exceptional" Case Warranting an Award of Fees ............18

        2.    Even If The Case Is Found Exceptional, Fees Should Be Denied.............20

IV.   CONCLUSION....................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Asch Webhosting, Inc. v. Adelphia Bus. Solutions Inv., LLC*,
    2006 WL 1098235 (D.N.J. Mar. 31, 2006)...........................................................................19

*Averbach v. Rival Mfg. Co.*,
    809 F.2d 1016 (3d Cir. 1987)................................................................................11, 14

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)..........................................................................................................13

*Chemtech Royalty Associates L.P. v. United States*,
    2013 U.S. Dist. LEXIS 26329 (M.D. La. Feb. 26, 2013), *aff'd in relevant part*, 2014
    U.S. App. LEXIS 17490 (5th Cir. Sept. 10, 2014) ................................2, 4, 5, 8, 11

*Cleveland Demolition Co. v. Azcon Scrap Corp.*,
    827 F.2d 984 (4th Cir. 1987) ...................................................................................19

*Dow Chem. Co. v. NOVA Chems. Corp.*,
    458 Fed. App'x 910 (Fed. Cir. 2012)................................................2, 4, 5, 9, 17

*EON Corp. IP Holdings, LLC v. FLO TV Inc.*,
    No. 10-812, 2014 WL 2196418 (D. Del. May 27, 2014) .......................................17

*Harre v. A.H. Robins Co.*,
    750 F.2d 1501 (11th Cir. 1985), *modified*, 866 F.3d 1303 (11th Cir. 1989) ..........................17

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
    322 U.S. 238 (1944)..........................................................................11, 14, 18, 19

*Interspiro USA, Inc. v. Figgie Int'l Inc.*,
    18 F.3d 927 (Fed. Cir. 1994).....................................................................................17

*Kilopass Tech. Inc. v. Sidense Corp.*,
    No. 10-02066, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) ..............................20

*Lumen View Tech., LLC v. Findthebest.com, Inc.*,
    --- F. Supp.2d ----, 2014 WL 2440867 (S.D.N.Y. May 30, 2014).........................20

*Martin v. Brown*,
    63 F.3d 1252 (3d Cir. 1995)....................................................................................13

*Modine Mfg. Co. v. Allen Group, Inc.*,
    917 F.2d 538 (Fed. Cir.1990)....................................................................................20

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) ..................................................................................................18, 20

*Phillips Petroleum Co. v. U.S. Steel Corp.*,
    673 F. Supp. 1278 (D. Del. 1987) .........................................................................................15

*In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*,
    278 F.3d 175 (3d Cir. 2002) ..................................................................................................13

*Pumphrey v. K.W. Thompson Tool Co.*,
    62 F.3d 1128 (9th Cir. 1995) .................................................................................................14

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
    668 F.3d 677 (9th Cir. 2012) .................................................................................................19

*United Bus. Commc'ns, Inc. v. Racal-Milgo, Inc.*,
    591 F. Supp. 1172 (D. Kan. 1984) ........................................................................................19

*United States v. Burke*,
    2008 U.S. Dist. LEXIS 27125 (E.D. Pa. Apr. 4, 2008) at *14, *aff'd*, 321 Fed. App'x
    125 (3d Cir. 2009) ..................................................................................................................11

*Vanwyk Textile Systems, B.V. v. Zimmer Machinery America, Inc.*,
    994 F. Supp. 350 (W.D.N.C. 1997) .......................................................................................20

*Williams v. Giant Eagle Markets, Inc.*,
    883 F.2d 1184 (3d Cir. 1989) ................................................................................................13

**State Cases**

*Johnson v. Preferred Prof'l Ins. Co.*,
    91 A.3d 994, *appeal denied sub nom.* 89 A.3d 478 (Del. Super. Ct. 2014) ..........................15

**Federal Statutes**

28 U.S.C. § 1927 ...........................................................................................................................13

35 U.S.C. § 285 .......................................................................................................................17, 20

**Rules**

Fed. R. Civ. P. 11 ............................................................................................................................2

Fed. R. Civ. P. 12 ..........................................................................................................................15

Fed. R. Civ. P. 60(d) ...................................................................................................................7, 11

## I.   INTRODUCTION

NOVA and its counsel fully recognized the seriousness of an independent action in equity against Dow alleging fraud on NOVA and fraud on the Court.  NOVA's allegations were not asserted lightly or in bad faith.  Rather, they were the product of a careful and detailed review of the available record and applicable legal standards and a sincerely-held reasonable belief that Dow and its counsel had systematically withheld evidence, altered documents, and knowingly presented false testimony and arguments to the Courts in a manner that rendered the original judgment a grave miscarriage of justice.

The caution, deliberation, and care taken by NOVA in filing its independent action is set out in detail in the following attached declarations of:

- Retired Federal Circuit Chief Judge Paul R. Michel (Ex. 1);
- Retired U.S. District Court Judge John C. Lifland (Ex. 2);
- Representatives of NOVA's outside law firms:  Former U.S. District Court Judge and F.B.I. Director Louis J. Freeh (Ex. 3) and Messrs. Mark J. Feldstein (Ex. 4), H. Woodruff Turner (Ex. 5), and Richard L. Horwitz (Ex. 6);
- Members of NOVA's in-house legal department:  Vice-President and General Counsel William C. Mitchell (Ex. 7) and Chief Intellectual Property Counsel Gary F. Matz (Ex. 8); and
- NOVA's consultant Professor Richard D. Pomp (Ex. 9).

NOVA, its attorneys, and its consulting former judges were all cognizant of the high standard of proof needed to prevail at trial, yet everyone involved in NOVA's pre-suit investigation reasonably believed that NOVA had a good faith basis to institute such an action.[1]  In addition, it was believed that NOVA was entitled to discovery that would likely further substantiate its allegations, the details of which were almost exclusively within Dow's custody or control.[2]

---

[1] *See, e.g.*, Ex. 1 at ¶¶ 7, 12-13, 17, 34-35; Ex. 2 at ¶¶ 5, 9-11; Ex. 3 at ¶¶ 10, 21-22, 27; Ex. 4 at ¶¶ 3, 15; Ex. 5 at ¶¶ 10-14, 17-18; Ex. 6 at  ¶¶ 7, 11-14; Ex. 7 at ¶¶ 27-31, 40-43; Ex. 8 at ¶¶ 12, 19-20, 23.

[2] *See, e.g.*, Ex. 1 at ¶¶ 7, 17, 20, 36-37; Ex. 3 at ¶¶ 11, 16; Ex. 4 at ¶¶ 29-31; Ex. 5 at ¶¶ 6, 17-18; Ex. 6 at ¶ 13; Ex. 7 at ¶ 41; Ex. 8 at ¶ 23.

Although NOVA did not prevail on Dow's motion to dismiss before this Court, NOVA's pleadings were not meritless, frivolous, or exceptional.  Indeed, prior to oral argument, in the context of seeking to resolve related litigation, Dow advised NOVA in writing that it could continue with this action and never suggested that this complaint was frivolous or otherwise in violation of Rule 11.  Ex. 4 at ¶ 22; *see also* Ex. 3 at ¶ 28; Ex. 6 at ¶ 14.

## II.    NOVA'S COUNTERSTATEMENT OF FACTS

NOVA does not intend to use this brief to convince the Court to reconsider its dismissal of NOVA's Amended Complaint.  Nonetheless, some elaboration of the facts is necessary because a proper understanding of Dow's conduct in the original infringement action, the scheme at issue in the *Chemtech* litigation, developments in the Canadian litigation, and how they led to NOVA's contentions in the present case is critical to the Court's determination as to whether such positions warrant the imposition of sanctions or an award of attorneys' fees.

### A.    Dow's Conduct and Valenzuela's Testimony Raised Serious Issues About Whether Dow Misled the Courts About Its Standing to Enforce Its Patents

Dow's standing to bring its 2005 infringement suit against NOVA has been hotly contested.  On the evidence then available, Judge Farnan believed that it was a close call whether Dow had standing to bring its 2005 suit, noting that the question was "a substantial issue[] for appeal."  Original Action, D.I. 603 at 2.  The Federal Circuit panel split on standing, with Judge Reyna issuing a 28-page dissent.  *Dow Chem. Co. v. NOVA Chems. Corp.*, 458 Fed. App'x 910, 916, 922 (Fed. Cir. 2012).  Since then, new facts have come to light which undermine the Courts' reliance on "Schedule B Supplement" as Schedule A to the Contribution Agreement and gave NOVA and its counsel more than a reasonable basis to believe that Dow and its counsel had misled the Courts regarding the Contribution Agreement's transfer of Dow's U.S. patents.

The conduct of Dow and its counsel during the initial action had raised suspicions.  On

January 1, 2002, Dow had entered into a Contribution Agreement with DGTI that stated that it "hereby convey[ed], transfer[ed], assign[ed] and deliver[ed] to DGTI … all of [Dow's] right and title to and interest in the Patent Rights ...."  D.I. 11 at ¶ 62; Ex. 12 at 4-5.  But despite NOVA's requests for information relating to Dow's ownership of the patents-in-suit, Dow did not reveal the Contribution Agreement's existence until after the close of fact discovery.  D.I. 11 at ¶¶ 47, 50, 55.  Simultaneous with the production of the Contribution Agreement in 2009, Dow also produced (1) an undated "Schedule A" that, although it identified no specific patents by number, nonetheless stated that *"[as] of the Transfer Date*, this Schedule includes all Patent Rights of [Dow] . . . , excluding the Excluded Patents set forth in Schedule 'D'" (Ex. 13 (emphasis added), and (2) a version of "Schedule D" that Dow had created only days earlier to make it appear that the patents-in-suit had not been transferred from Dow (Ex. 14).  D.I. 11 at ¶¶ 59, 63-65, 67-68.  Only after further inquiry by NOVA did Dow produce a version of "Schedule D" (Ex. 15) that was created on February 18, 2002 (albeit one that was last modified on February 3, 2009 after the date of suit) and did *not* list the patents-in-suit as Excluded Assets.  D.I. 11 at ¶ 66.  Dow also produced a "Schedule B Supplement" (Ex. 16) modified **after** the complaint was filed that it al- leged was the governing "Schedule A" (which also did not list the patents).  D.I. 11 at ¶¶ 67-68.

Judge Farnan and two Federal Circuit judges ultimately concluded that the Contribution Agreement was unambiguous in its intent to transfer only patents listed on Schedule A.  But this did not resolve the question of identifying what was the actual "Schedule A."  On that point, both Courts relied on extrinsic evidence (similar to the type NOVA relies upon here) in the form of testimony by Dow's paralegal, Kate Maxwell, to hold that the version of "Schedule B Supple- ment" produced by Dow—which was not in existence when the lawsuit was filed —was actually "Schedule A" and accurately reflected Dow's patent ownership at the outset of the suit.  The dis-

3

sent strongly disagreed.  *Dow Chem.*, 458 Fed. App'x at 922-35.  In particular, Judge Reyna not-
ed the fact that the Schedule B Supplement contained only four pre-2002 U.S. patents "strain[ed]
credibility" in light of the tax purposes behind the Contribution Agreement.  *Id.* at 931.

It was against this backdrop of the Courts' reliance on extrinsic evidence – and the credi-
bility of Ms. Maxwell in particular – that NOVA learned in 2013 about *Chemtech Royalty As-
socs. L.P. v. United States*, 2013 U.S. Dist. LEXIS 26329 at 65 (M.D. La. Feb. 26, 2013), *aff'd in
relevant part*, 2014 U.S. App. LEXIS 17490 (5th Cir. Sept. 10, 2014).  Ex. 4 at ¶ 16; Ex. 5 at ¶ 6;
Ex. 7 at ¶¶ 12-14.  *Chemtech* was a tax case that held that Dow's "assignment and transfer back"
of "high value" U.S. patent rights to a subsidiary[3] under the Chemtech agreement (an arrange-
ment that paralleled Dow's subsequent "assignment and transfer back" of its patents to DGTI
under the 2002 Contribution Agreement) was a "sham" partnership with "no legitimate business
purposes other than tax avoidance."  *Id.* at *4, *68, *72.

NOVA discovered that, during the *Chemtech* trial, Edward Valenzuela, a Dow valuations
specialist in charge of royalty payments to related companies and the tax consequences of those
payments, had testified on direct that Dow had transferred "all" its patents to DGTI (via the Con-
tribution Agreement), which would have included thousands of U.S. patents:

> Q.    Mr. Valenzuela, after the patents were distributed out of Chemtech in
>       1998, what further involvement did you have with respect to the patents?
> A.    We continued to do the quarterly QPM's and earned royalties and
>       determine payments up until the end of 2001 **when I think all of Dow's
>       patents were contributed to an intangible holding company**.
> Q.    So Dow continued to license the patents, but they were owned by a differ-
>       ent entity?
> A.    That's correct.

Ex. 17 at 254 (emphasis added); D.I. 11 at ¶¶ 43, 78.  On cross-examination by the Unit-
ed States, Mr. Valenzuela reaffirmed that he continued to compute royalties and QPM's

---

[3]  This subsidiary was a predecessor company to Dow Global Technologies Inc. ("DGTI").

"[u]ntil sometime **in 2001 or 2002** when this intangible holding company came into existence, **and then all patents were contributed**." Ex. 17 at 259 (emphasis added).

> Q.  Well, who owned it, what did [this holding company] do; what was it?
> A.  It -- it collected **all of Dow's patents**. So **all of Dow's patents were contributed to this intangible holding company**.
> Q.  And this was a subsidiary of Dow?
> A.  Yes.

Ex. 17 at 259-60 (emphasis added); D.I. 11 at ¶¶ 44, 78; *see also* D.I. 11 at ¶¶ 81, 88.  Although this Court characterized the testimony of Mr. Valenzuela as occurring "in another action that has nothing to do with the authenticity of Schedule A," Tr. at 55, it is apparent from the context that Mr. Valenzuela was referring to the 2002 Contribution Agreement where patents were "contributed" to DGTI, and not the 1993 *Chemtech* Agreement.[4]

Mr. Valenzuela's testimony thus directly contradicts representations made by Dow's counsel to this Court, the Federal Circuit, and the Supreme Court, that the 2002 Contribution Agreement did not effectuate an *en masse* transfer of U.S. patents.  D.I. 11 at ¶¶ 69, 77-78, 81; *see, e.g.*, Dow's Fed. Cir. Br. at 6-7.  Mr. Valenzuela's testimony, therefore, would have been critical in undermining Ms. Maxwell's testimony and likely would have precluded the Courts' acceptance as Schedule A of a "Schedule B Supplement" that only listed four of Dow's over 7,000 pre-2002 U.S. patents.[5]

### B.  Dr. Soares Gave Testimony in the Canadian Action that Undermined the Key Elements of His Testimony in the Original Infringement Action

The holding that NOVA had infringed Dow's patents rested heavily on the testimony of Dow's expert witness, Dr. Soares.  One infringement issue was whether the polymer in NOVA's accused product contained a certain amount of a high density "Component B" polymer that was "heterogeneously branched."  *Dow Chem.*, 458 Fed. App'x at 921.  In the original infringement

---

[4]  Ex. 9 at ¶ 18; *see also* Ex. 1 at ¶¶ 27, 33; Ex. 5 at ¶ 8; Ex. 7 at ¶¶ 16, 19.
[5]  Ex. 3 at ¶¶ 17-18; Ex. 4 at ¶¶ 8-9; Ex. 5 at ¶¶ 8-9; Ex. 7 at ¶¶ at 17-22, 26, 39-40. Ex. 9 at ¶ 19.

action, it was Dr. Soares' testimony about the two different tests that he performed on NOVA's products that, according to the Federal Circuit, "gave the jury sufficient justification to find" that the "HD Fraction" in NOVA's products was the heterogeneously branched Component B. *Id.*

In the Canadian action,[6] however, Dr. Soares subsequently admitted that some samples of allegedly "separated" HD fractions were in fact contaminated by Component A (material from reactor 1); that he "didn't believe" at any time that the TREF technique he used could separate blends of materials that have similar crystallization properties; and that to do so is "[p]erhaps impossible." D.I. 11 at ¶¶ 119-120.  NOVA believes that this new testimony is irreconcilable with Dr. Soares' earlier testimony to the Delaware jury, where he stated that he had "actually" separated off the HD fractions in some of the same product grades and that it was "relatively easy" to do so.  D.I. at ¶ 120; Ex. 4 at ¶ 20; Ex. 5 at ¶ 12; Ex. 7 at ¶ 18.  Moreover, Dr. Soares

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  Ex. 18 at 128-29; Ex. 4 at ¶ 10.  If Dr. Soares was not able to obtain clean separation, then NOVA believes that his infringement proofs in Delaware were conducted on samples of "Component B" material that were contaminated with a portion of "Component A" material and therefore would be incapable of proving that NOVA's products necessarily met all the requirements for the Component B polymer recited in the claims of the patents-in-suit.[7]  *See* Ex. 4 at ¶ 11; Ex. 8 at ¶ 18.

---

[6] Although a Canadian judge ruled that NOVA infringed Dow's Canadian patent, that determination is on appeal, the Component B separation issue was not addressed in his opinion, and the standard for determining infringement in Canada is not the same as that in the United States.

[7] Dow repeats the argument at page 7 of its brief that NOVA had itself successfully separated the HDF component more than 40 times.  Dow, however, fails to inform that Court that NOVA's tests used different equipment and a different method than that used by Dr. Soares, that the NOVA separations were not conducted for the purpose of determining whether NOVA's prod-

**C.      NOVA and Its Counsel Conducted a Careful Pre-Suit Investigation**

The newly-discovered facts in the Louisiana and Canadian actions were persuasive, objective evidence that strongly suggested that Dow's infringement judgment had been obtained in reliance on false information that Dow and its counsel had provided to NOVA and the Courts. As set forth in detail in the attached declarations (Exs. 1-9), NOVA and its counsel proceeded with extreme care before filing an independent action seeking relief from the judgment, amending its complaint, opposing Dow's motion to dismiss, and preparing for oral argument.

NOVA and its counsel conducted a detailed study over roughly a 15-month period that involved researching and considering the merits of bringing an action in equity against Dow. *See*, *e.g.*, Ex. 7 at ¶ 31. The process began after NOVA received samples from Dow in the Canadian litigation in the summer of 2012. NOVA's analysis of those samples over the following months suggested that Dow's testing evidence and protocols differed from and conflicted with infringement positions that Dow had taken in the Delaware Action in a number of significant respects, including the lack of separation issue.[8] But in keeping with its cautious and deliberative approach, NOVA decided to wait until expert reports had been filed in Canada in January 2013 and Dr. Soares had been deposed in February 2013 before making any decision whether to pursue relief from the judgment. Ex. 4 at ¶¶ 14, 9-10; Ex. 7 at ¶ 9; Ex. 8 at ¶¶ 6, 9.

As an additional check, NOVA and its counsel decided in late February 2013 to obtain the input of former Judge Lifland on an early version of the filing, which was then styled as a Rule 60(d) motion.[9] While Judge Lifland was of the opinion that certain arguments needed to be shortened and made less technical, he agreed that NOVA "had presented a plausible and good-

---

ucts satisfied the "Component B" limitations of the patents-in-suit, and that the Dow separations did in fact result in contamination of some polymers. Ex. 4 at ¶¶ 25-26; Ex. 8 at ¶ 11.

[8] Ex. 4 at ¶¶ 7-9, 12-14; Ex. 5 at ¶ 6; Ex. 7 at ¶ 8; Ex. 8 at ¶¶ 5-6.

[9] Ex. 4 at ¶ 15; Ex. 5 at ¶ 6; Ex. 7 at ¶ 10; Ex. 8 at ¶ 12.

faith basis" for seeking relief from judgment on the lack of separation issue.[10]  In particular, he noted that the "facts appeared to generate knowingly contradictory testimony from a paid expert," that such a contradictory opinion was not available to NOVA in the Delaware trial, and that "such an apparent contradiction should be explored by the Court."  Ex. 2 at ¶¶ 9-10.

While this process was ongoing, NOVA learned about the *Chemtech* decision.[11]  In July 2013, NOVA retained former Judge Freeh and the Pepper Hamilton firm to independently advise it about Dow's seemingly inconsistent positions in the Louisiana and Delaware litigations.[12]  Finnegan Henderson also subsequently retained on NOVA's behalf Professor Richard Pomp, an expert in state tax law, to determine, *inter alia*, the relevance of *Chemtech* to the Delaware standing issue.  Ex. 7 at ¶ 39; Ex. 9 at ¶¶ 6, 21.

NOVA and its counsel reviewed Mr. Valenzuela's testimony and formed the belief that Mr. Valenzuela's testimony undermined Ms. Maxwell's extrinsic evidence identifying "Schedule B Supplement" as the relevant Schedule A and would have led to a different result on standing.[13]

By August 2013, outside counsel prepared a draft complaint that included the standing issue based on the Valenzuela testimony in addition to the Soares separation issue.  Ex 4. at ¶ 19.  It was decided not to pursue the other infringement issues because they were highly technical and less straightforward to explain.  Ex. 4 at ¶ 21; Ex. 8 at ¶ 16.  Further revisions were made after Dr. Soares testified at trial in Canada, providing additional support for NOVA's belief that his testimony was irreconcilable with his testimony in the Delaware Action.  Ex. 4 at ¶¶ 20-21.

NOVA's draft complaint underwent numerous revisions and refinements before being filed on September 23, 2013.  These revisions were based on input from several outside law

---

[10] Ex. 2 at ¶¶ 6-7, 9; *see also* Ex. 4 at ¶ 15; Ex. 5 at ¶ 6; Ex. 8 at ¶ 13.

[11] Ex. 4 at ¶ 16; Ex. 5 at ¶ 7; Ex. 7 at ¶¶ 12-14.

[12] Ex. 3 at ¶¶ 5-6; Ex. 4 at ¶ 17; Ex. 7 at ¶ 27; Ex. 8 at ¶ 15.

[13] Ex. 3 at ¶¶ 17-18; Ex. 4 at ¶ 18; Ex. 5 at ¶¶ 8-9; Ex. 6 at ¶ 11; Ex. 7 at ¶¶ at 17-22.

firms representing NOVA.[14]  As noted above, NOVA also asked former Judge Freeh and Pepper

Hamilton to act as a fresh set of eyes and to provide independent advice, unencumbered by any

prior involvement in the Delaware infringement action, on the propriety of filing an independent

action in equity.  Judge Freeh and Pepper Hamilton agreed that NOVA had a plausible, good

faith basis for filing the complaint, and entered its appearance in this action.[15]

### D.    NOVA's First Amended Complaint in Response to Dow's Motion to Dismiss

NOVA amended its complaint to rebut arguments raised by Dow and to include new in-

formation obtained in the Canadian action that was not available to it in the Delaware Action.

For example, by November 2013, Dow had produced in the Canadian case a copy of the Contri-

bution Agreement

---

[14] Ex. 4 at ¶ 21; *see also* Ex. 3 at ¶ 21; Ex. 5 at ¶ 14; Ex. 7 at ¶¶ 30-31; Ex. 8 at ¶ 20.
[15]  *See, e.g.*, Ex. 3 at ¶¶ 6, 14-19, 22, 27; Ex. 7 at ¶¶ 28-31.
[16] *See* Ex. 4 at ¶ 31; Ex. 5 at ¶ 15; Ex. 6 at ¶ 13.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Dow attaches as Exhibit 1 to its brief a July 2, 2009 letter from Dow's counsel to show that the version of Schedule A produced on June 19, 2009 had long been known to NOVA to have been prepared by Dow in June 2009.  NOVA has never disputed that the 2009 version of Schedule A, like the version of Schedule B Supplement relied upon by Dow and the Courts, did not exist when that Dow brought suit in October 2005.  However, as between the 2009 Schedule A and Schedule B Supplement, both of which were last modified ***after*** this lawsuit was filed, the 2009 Schedule A was the only credible one since it was the only one consistent with the Valen-zuela testimony.[17]  Moreover, the July 2, 2009 letter also states that "[d]rafts of schedule A, which ***originally listed the transferred patents*** . . . were  prepared beginning in 2002."  D.I. 31, Ex. 1 (emphasis added).  To date, no version of Schedule A dated prior to the filing date of the lawsuit has ever been produced to NOVA.  It is also uncontested that the document called Schedule B Supplement was merely a printout from Dow's internal patent database, showing a "last modified" date two months *after* the date of suit, and was never updated to reflect the trans-fer of pre-2002 U.S. patents to DGTI via the Contribution Agreement.  Ex. 10 at 97-98, 131, 236. This letter must also be read in conjunction with Dow's later admission that the patents-in-suit "did not appear on either Schedule A or Schedule D in 2005, when this lawsuit was filed."  (Dow Fed. Cir. Br. at 36.)

The other significant change in the Amended Complaint was to identify, to the extent possible, the level of attorney involvement in the alleged fraud on the Court, a separate claim

---

[17] Ex. 7 at ¶ 24; *see also* Ex. 4 at ¶ 31; Ex. 5 at ¶ 8.

from NOVA's claim for fraud on NOVA, the latter of which requires no attorney involvement.[18]

████████████████████████████████████████████████ Mr. Isley, Dow's Associate General

Counsel, ████████████████████████████████████████. D.I. 11 at ¶ 73.  As a

supervisory attorney for Dow, he later interacted with personnel in Dow's tax, litigation, and in-

tellectual property departments.  Mr. Isley was knowledgeable about the *Chemtech* litigation and

met in 2009 with Mr. Simpson, then Dow's managing attorney on the Delaware Action, who was

concerned about the need to produce a copy of the Contribution Agreement to NOVA and its ef-

fect on the ownership of the patents-in-suit.  D.I. 11 at ¶¶ 53-54.  Mr. Isley discussed Simpson's

concerns about the agreement, and approved both the Quitclaim Assignment and the post-dated

schedules.  D.I. 11 at ¶¶ 53, 61.  Bruce Kanuch, Dow's former Managing Counsel for Litigation

who testified at trial about Dow's alleged ownership of the patents, ████████████████████

████████████████████████████████████, and was familiar with the *Chemtech* agree-

ment.  D.I. 11 at ¶¶ 52, 73, 77.

In particular, Mr. Simpson brought the Contribution Agreement to the attention of trial

counsel and worked with trial counsel on the production of revised Schedules A and D and the

Quitclaim Assignment before responding to NOVA's discovery requests.  D.I. 11 at ¶¶ 53-54,

56-57, 59-60; *see also* Ex. 4 at ¶ 28.  Also involved in the alteration of the schedules were Dow

attorneys Noreen Warrick, an officer of DGTI, Michael Glenn, Dow's Associate General Coun-

sel for Intellectual Property, and Guy Relford, Simpson's supervisor in the litigation department.

D.I. 11 at ¶¶ 53, 61.  Thus, it appeared that Dow attorneys, including senior legal officers, were

---

[18] *See Averbach v. Rival Mfg. Co.*, 809 F.2d 1016, 1021-22 (3d Cir. 1987) (no authority exists to "limit an independent action for relief from a judgment to 'fraud on the court' as distinguished from fraud of some other sort" and noting that "[t]he *Hazel-Atlas* rule . . .has nothing to do with the elements of a cause of action for" ordinary fraud on a party); *United States v. Burke*, 2008 U.S. Dist. LEXIS 27125 (E.D. Pa. Apr. 4, 2008) at *14, *aff'd*, 321 Fed. App'x 125 (3d Cir. 2009) (Rule 60(d)(1) and (d)(3)-type claims are "separate actions" to be separately analyzed).

involved in what NOVA believed was Dow's fraudulent misrepresentation of the Contribution Agreement's treatment of U.S. patents. *See also* Ex. 3 at ¶ 20; Ex. 4 at ¶ 28; Ex. 5 at ¶¶ 11-12.

Additionally, Dow's trial counsel were intimately involved in directing testing of the NOVA's accused products, and then selectively providing limited work product information to its experts, including Dr. Soares, while withholding presumably unfavorable test results from both Dr. Soares and NOVA.  D.I. 11 at ¶¶ 18, 128-132; Ex. 4 at ¶¶ 26, 28.  Dow relied on work product separation testing at the start of the case in late 2005 to assert that 17.7% of NOVA's product was Component B.  Such a large fraction would have been contaminated with multiple components and was not pursued by Dow at trial.  Instead, it ultimately relied on subsequent testing to assert at trial that Component B was about 5% of NOVA's product.  Ex. 4 at ¶ 26.  Moreover, as discussed in Mr. Feldstein's declaration, NOVA believes that Dow's counsel was complicit in the fraud on the Court because they specifically and repeatedly elicited the precise testimony from Dr. Soares that the alleged separation was "easy" and "actually isolated" that Dr. Soares later repudiated in the Canadian litigation.  Ex. 4 at ¶¶ 27-28.

### E.    NOVA Sought the Advice of Former Federal Circuit Chief Judge Paul R. Michel

After Dow filed its second motion to dismiss, NOVA asked former Federal Circuit Chief Judge Paul R. Michel to review Dow's motion to dismiss, NOVA's amended complaint, and various draft responses to Dow's motion.[19]  In addition, Judge Michel also participated in a mock argument along with Judge Freeh and NOVA's counsel.[20]  As discussed in his declaration, Judge Michel agreed that NOVA had raised plausible, non-frivolous allegations that Dow and its counsel had deliberately misled and deceived Judge Farnan and that Dr. Soares was culpably impli-

---

[19] Ex. 1 at ¶¶ 3-5; Ex. 4 at ¶ 29; Ex. 5 at ¶ 17; Ex. 7 at ¶ 40; Ex. 8 at ¶ 22.
[20] Ex. 1 at ¶¶  8-13; Ex. 3 at ¶ 25; Ex. 4 at ¶ 30; Ex. 5 at ¶ 17; Ex. 6 at ¶ 15; Ex. 7 at ¶ 41; Ex. 8 at ¶ 23.

cated in the fraud, was of the view that, had Valenzuela's testimony been presented to Judge

Farnan, his standing decision would likely have been different, and concluded that NOVA

should be able to pursue discovery on the standing and Soares separation issues, which would

likely provide further factual support for NOVA's claim.[21]

## III.    ARGUMENT

### A.    The Court Should Not Impose Sanctions Under § 1927 or Its Inherent Power

An award of sanctions against an attorney under 28 U.S.C. § 1927 requires a finding that

"an attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3)

thereby increasing the cost of the proceedings;  and (4) doing so in bad faith or by intentional

misconduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 188 (3d

Cir. 2002).[22] A fee award under the court's inherent power likewise requires a showing of bad

faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-47 (1991) ("[T]he narrow exceptions to the

American Rule effectively limit a court's inherent power to impose attorney's fees as a sanction

to cases in which a litigant has engaged in bad-faith conduct[.]").  The Supreme Court has ad-

monished that a court must "exercise caution … both in determining that the requisite bad faith

exists and in assessing fees." *Id.*  at 50.  Moreover, sanctions under the Court's inherent power

"should be reserved for cases in which the conduct of a party or an attorney is egregious and no

other basis for sanctions exists." *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995).

Dow has not met these demanding standards.  Although NOVA's action did not succeed,

it was not so meritless as to warrant sanctions.  *See infra* pp. 18-20.  Although the Court stated

that the Amended Complaint included "no adequate allegation of the grave miscarriage of jus-

---

[21] *See, e.g.*, Ex. 1 at ¶¶ 6-7, 12-17, 20, 23, 28-32, 34-37; *see also* Ex. 4 at ¶¶ 29-30; Ex. 5 at ¶ 17; Ex. 6 at ¶ 11; Ex. 7 at ¶ 40; Ex. 8 at ¶ 23.

[22] Sanctions under § 1927 are not applicable against a party. *Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1191 (3d Cir. 1989).

tice," NOVA's counsel reasonably believed the misrepresentation of the Contribution Agreement's intent to transfer U.S. patents and the ability of Dr. Soares' testing to completely separate Component A from Component B were similar in kind to the misrepresentation of the unbiased third party authorship of the article in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) or the misrepresentations about the occurrence of prior fires with the device in *Averbach*. *See infra* at pp.18-19; *see also* Ex. 5 at ¶¶ 11-12. Furthermore, while the Court stated that NOVA had not adequately pled "the involvement in that intentional fraud by an Officer of the Court," Tr. at 54, counsel reasonably believed that no involvement of an officer of the court was required to plead ordinary fraud upon NOVA as in *Averbach*. *See, e.g.*, Ex. 5 at ¶ 12.

Moreover, counsel reasonably believed that, for the allegation of fraud on the Court, they had pled adequate facts to assert that Dow in-house counsel including Messrs. Islely, Glenn, Relford, Kanuch and Simpson, as well as Ms. Warrick, were aware of the misrepresentations concerning the Contribution Agreement's intended treatment of U.S. patents. *See supra* pp.11-12. This involvement was alone sufficient because in-house counsel can be considered officers of the court, even if the specific counsel involved did not enter an appearance. *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir. 1995). In any event, trial counsel's involvement with in-house counsel, as well as their involvement with the Quitclaim Assignment and delay in production of the Contribution Agreement and all versions of its Schedules, also provided a reasonable basis to conclude that in-house counsel's knowledge of the agreement's intent to transfer U.S. patents had been conveyed to trial counsel. Moreover, NOVA and its counsel reasonably believed that Dow's trial counsel were aware of contamination affecting the accuracy of test results and were complicit in eliciting Dr. Soares' testimony about separation that he subsequently repudiated in Canada. *See supra* p.12.

Dow has also failed to meet its burden of proving that the suit was brought in bad faith. As discussed above and in the attached declarations, NOVA's counsel proceeded cautiously both in their pre-suit investigation and throughout the action. They knew that NOVA's allegations were serious and should not be lightly made. They spent over a year analyzing the facts and re-searching the legal basis for NOVA's complaint. They refined and narrowed the claims being raised to streamline the proceedings. They also brought in an additional law firm, a tax law pro-fessor, and three former federal judges to review the papers at various stages and/or to provide independent advice on how NOVA should proceed. Neither NOVA's counsel nor its consultants believed that its pleadings were meritless, frivolous, or lacking in good faith. *See supra* p.1 fn. 1. Nor can it be said that the purpose of NOVA's independent action was to harass Dow, needlessly protract litigation between the parties, or willfully litigate in bad faith.[23]

Dow's allegations to the contrary rest on the very type of baseless assertions that its mo-tion purports to condemn. Counsel did not believe "that their clients' claims were frivolous." Br. at 16. As the declarations cited in footnote 1 make clear, Dow's assertion is false. Dow also contends that NOVA's counsel supposedly "tried to hide behind the Rule 12 pleading standard." *Id*. NOVA's counsel, however, repeatedly acknowledged the heavy burden that it was required to satisfy.[24]

---

[23] *See*, *e.g.*, Ex. 1 at ¶¶ 15, 18; Ex. 2 at ¶ 11; Ex. 3 at ¶ 27; Ex. 5 at ¶ 10.

[24] Tr. at 30-31, D.I. 18 at 15-16. *Cf. Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F. Supp. 1278, 1358 (D. Del. 1987) (sanctions denied where "counsel candidly admitted to the Court that they bore a heavy burden of persuasion"). The Rule 12 standard applies to an allegation of fraud on the court, *Johnson v. Preferred Prof'l Ins. Co.,* 91 A.3d 994, *appeal denied sub nom.* 89 A.3d 478 (Del. Super. Ct. 2014), and reliance thereon is not sanctionable. Given that most of the evi-dence at issue is exclusively in Dow's control, it was appropriate for NOVA to make good-faith allegations based on the available facts in the expectation that discovery would uncover further facts supporting its claims such as, for example, ███████████████████████████████ ██████████████. *See* Ex. 4 at ¶ 31; Ex. 5 at ¶ 15; Ex. 6 at ¶ 13; Ex. 7 at ¶ 33.

Dow's argument that NOVA's conduct at the hearing "confirms" its bad faith is both a red herring and inaccurate.  NOVA's counsel at argument did not change NOVA's position on standing.  Dow represented that the Contribution Agreement deliberately did not transfer U.S. patents, and thereby persuaded the courts to accept "Schedule B Supplement" as Schedule A. D.I. 11 at ¶¶ 11, 15, 49, 77, 81, 83, 85, 88, 90-91.  Responding to an argument first raised in Dow's <u>reply</u> brief that "NOVA needed to plead that there was a Schedule A listing the patents in suit," D.I. 20 at 5, NOVA's counsel noted that the only document Dow ever produced that was both denominated "Schedule A" (other than the blank Schedule A placeholder at the time of execution) and was consistent with Mr. Valenzuela's testimony was the Schedule A referred to at the hearing.  Tr. at 26-29, 49-50; *see also* Ex. 4 at ¶ 31; Ex. 5 at ¶ 8; Ex. 7 at ¶¶ 24-25.  Although Dow argues that this document was created in 2009, after the suit was filed, NOVA's counsel similarly noted that "Schedule B Supplement" was last revised after the suit was filed and, "if there is a problem with one, there is a problem with all."  Tr. at 50; *see also* Ex. 4 at ¶ 31.

During the hearing, the Court also questioned the relevance of Valenzuela's testimony, given the Federal Circuit's conclusion that the language of the 2002 Contribution Agreement was clear and unambiguous.  Tr. at 34, 55.  NOVA's counsel accurately responded that NOVA was "not challenging the interpretation of the Contribution Agreement."  Tr. at 34; *see also* Tr. at 26, 27.  Instead, counsel relied upon the Valenzuela testimony not to determine the *meaning* of the agreement, but to contest Dow's *extrinsic evidence* that "Schedule B Supplement" was actually Schedule A.  Tr. at 26-27; *see also* Ex. 5 at ¶ 8; Ex. 6 at ¶ 11.  However, neither party can seriously dispute that extrinsic evidence is necessary to determine whether the patents-in-suit were transferred.  Ms. Maxwell's testimony that Schedule B Supplement was the operative Schedule A is by definition extrinsic evidence, and NOVA similarly was "not violating the rule

16

against extrinsic evidence" by "relying on the same kind of extrinsic evidence [e.g., Mr. Valen-zuela's testimony] to show what was Schedule A and what was the Schedule D that was reference in the Schedule A." Tr. at 34-35. *See also Dow Chem.*, 458 Fed. App'x at 929 n.2 (Reyna, J., dissenting) (observing that "the majority analyzes extrinsic evidence alleged to support its conclusion, such as testimony from Dow's paralegal Kathleen Maxwell on the issue of the accuracy and authenticity of the Schedule B Supplement in evidence."). Since NOVA was entitled to have all reasonable inferences drawn in its favor on this motion, it reasonably believed that it would be premature for the Court to disregard the relevance of Mr. Valenzuela's testimony.

Nor did NOVA's counsel disavow the Amended Complaint's allegations that Dr. Soares testified falsely. D.I. 31 at 8-9. NOVA's position is that Dr. Soares' knowingly inconsistent testimony is "part of the fraud" in combination with other elements. Tr. at 38. *Compare* D.I. 11 at ¶ 11 ("Dow, with the assistance of in-house and outside counsel, engaged in a deliberate scheme to interfere with and to defraud the trial and appellate courts. . . ."); *cf. Harre v. A.H. Robins Co.*, 750 F.2d 1501, 1505 (11th Cir. 1985) (new trial granted when expert witness gave inconsistent testimony with the apparent complicity of counsel given the questions asked in direct examination and comments made in closing arguments), *modified*, 866 F.3d 1303, 1304 (11th Cir. 1989).

### B. The Court Should Not Award Attorneys' Fees Against NOVA Under § 285

A court may "in exceptional cases … award reasonable attorney fees to the prevailing party" under 35 U.S.C. § 285. *Interspiro USA, Inc. v. Figgie Int'l Inc.,* 18 F.3d 927, 933 (Fed. Cir. 1994). Because this is not an exceptional case, Dow is not entitled to such an award. *See EON Corp. IP Holdings, LLC v. FLO TV Inc.,* No. 10-812, 2014 WL 2196418, at *2 (D. Del. May 27, 2014) (denying fees where counsel did not litigate case in an "unreasonable manner" and the substantive strength of party's litigating position was not exceptionally weak).

### 1. This Is Not an "Exceptional" Case Warranting an Award of Fees

A case is "exceptional" only when it stands out "with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). In deciding whether a case is "exceptional," courts consider the "totality of the circumstances," including "frivolousness, motivation, objective un-reasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 & n.6.

Though NOVA is disappointed that the Court dismissed its case, it operated in good faith at all times and respectfully submits that its position was not frivolous or objectively unreasona-ble. Indeed, NOVA specifically retained the services of former Judges Lifland, Michel, and Freeh, as well as those of Pepper Hamilton and Professor Pomp, in order to obtain objective opinions about the merits of its claims, independent from the advice it had obtained from its at-torneys. Consequently, their declarations (Exs. 1-3, 9) are particularly illuminating on the ques-tion of the reasonableness of NOVA's allegations. Taken as a whole, Mr. Valenzuela's testimo-ny in *Chemtech* that Dow had transferred all of its patents to DGTI, Dow's extended failure to respond in good faith to discovery requests relating to its ownership of the patents-in-suit, and Dr. Soares' conflicting testimony in the two patent infringement cases reasonably justified NOVA and its counsel's belief that Dow and its in-house and outside counsel had engaged in "a deliberately planned and carefully executed scheme to defraud [the court]." *Hazel-Atlas Glass Co.*, 322 U.S. at 245.

NOVA's allegations were comparable to previous successful fraud on the court claims, precluding a finding that its claim was objectively baseless. In *Hazel-Atlas*, for example, the de-fendant had obtained and enforced a patent on a glass-molding machine with the aid of an article

18

written by its attorneys and officials and published under the name of a supposedly disinterested expert.  In essence, the defendant had manufactured documents that ostensibly gave it the right to enforce a patent that it should not have possessed.  The Court held that the concocted article constituted a fraud on the Court and ordered that the judgment be set aside.  *Id.* at 246.

Here, Dow has never reconciled Mr. Valenzuela's testimony with Dow's arguments in the Delaware action.  Given Mr. Valenzuela's testimony, Dow's conduct in the Delaware action, and NOVA's due diligence, there was nothing unreasonable about NOVA's decision to bring this action and to seek further discovery.  *See supra* pp.2-5, 9-12; *cf. Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 688 (9th Cir. 2012) (under identical trademark attorneys' fees statute, where a plaintiff is "able to provide some legitimate evidence ... [his or her] case would likely fall on the unexceptional side of the dividing line").  Similarly, Dr. Soares' conflicting testimony was part of a "pattern of false testimony, fabrication, and nondisclosure of relevant information in a systematic effort to mislead a court" that fell within the ambit of *Hazel-Atlas*.  *See United Bus. Commc'ns, Inc. v. Racal-Milgo, Inc.*, 591 F. Supp. 1172, 1186-87 (D. Kan. 1984); *Asch Webhosting, Inc. v. Adelphia Bus. Solutions Inv., LLC,* 2006 WL 1098235 (D.N.J. Mar. 31, 2006).  Dow's contention that NOVA did not allege sufficient attorney involvement is also incorrect.  *See supra* pp.11-12.  Thus, while NOVA's pleading may not have survived Dow's motion to dismiss, it cannot be said to be so baseless as to render the case "exceptional."[25]

---

[25] *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984 (4th Cir. 1987), where sanctions were awarded for baseless allegations of attorney misconduct, is distinguishable.  First, the court relied on Fourth Circuit precedent that "fabricated evidence" was not "grounds for relief," *id.* at 988, but the law in the Third Circuit is to the contrary.  Second, the party in *Cleveland* had an opportunity to use conflicting testimony to impeach the witness at trial, but failed to do so, whereas NOVA did not have the newly-discovered evidence to use in the Delaware Action.  Third, the party in *Cleveland* failed to conduct a reasonable investigation to determine whether its complaint was "warranted by existing law," whereas NOVA undertook an extensive investigation of both the facts and the law and had a good faith belief that its claim was reasonable.

### 2.    Even If The Case Is Found Exceptional, Fees Should Be Denied

Even where a case is "exceptional," the "decision whether or not to award fees is still committed to the discretion of the trial judge, and 'even an exceptional case does not require in all circumstances the award of attorney fees.'" *Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-02066, 2014 WL 3956703 at \*14 (N.D. Cal. Aug. 12, 2014) (quoting *Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed. Cir. 1990)); *Octane Fitness*, 134 S. Ct. at 1755-56 (court has discretion to award fees if it finds a case exceptional).

NOVA respectfully contends an award of fees is not warranted here.  NOVA and its counsel engaged in extensive preparation over more than a year as part of a good faith effort to determine whether the serious allegations it set forth were justifiable under the circumstances. *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 2014 WL 2440867, at \*5 (S.D.N.Y. May 30, 2014) (plaintiff's pre-filing preparation is relevant to whether a court should award fees under § 285).  Three former federal judges and an additional law firm were strongly of the opinion that NOVA was alleging a claim that had merit and warranted further discovery.  NOVA and its counsel believed the same.  See *supra* p.1, fns. 1-2.  Under these facts, an award of fees to Dow is not justified.  *See, e.g.*, *Vanwyk Textile Systems, B.V. v. Zimmer Machinery America, Inc.,* 994 F. Supp. 350, 382 (W.D.N.C. 1997) ("A party should not be penalized for defending or prosecuting a lawsuit when the party has a good faith belief in its position.").

## IV.    CONCLUSION

For the reasons given above, Dow's motion should be denied.

Respectfully submitted,

SEITZ ROSS ARONSTAM & MORITZ LLP

 */s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
100 S. West Street, Suite 400
Wilmington, DE  19801
(302) 576-1600
cseitz@seitzross.com

*Counsel for Plaintiffs NOVA Chemicals Cor-
poration (Canada), NOVA Chemicals Inc.
(Delaware), and its Counsel*

Dated:  October 20, 2014